# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEONARD MICHAEL MARELLA, | CASE NO. 03cv660-BEN (MDD) |
| Plaintiff, | REPORT AND RECOMMENDATION RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| vs. | |
| C.A. TERHUNE, DIRECTOR OF THE CALIFORNIA DEPARTMENT OF CORRECTIONS, et al., | [Doc. No. 50] |
| Defendant. | |

## I.    PROCEDURAL HISTORY

On April 2, 2003, Leonard Michael Marella ("Plaintiff") filed a Complaint against C.A. Terhune, et al. ("Defendants"), for violating his civil rights under 42 U.S.C. § 1983, raising three grounds for relief.  (Doc. No. 1).  In Count One, Plaintiff claims infliction of disfigurement, physical injury, pain, and emotional distress in violation of the Eighth and Fourteenth Amendments. Id. at 8.  In Count Two, Plaintiff claims Defendants conspired to deprive Plaintiff of his right to freedom from cruel and unusual punishment, in violation of the Eighth and Fourteenth Amendments.  Id. at 9.  In Count Three, Plaintiff claims cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments, state assault, state battery, and conspiracy to retaliate against Plaintiff.  Id. at 9-10.

Also on April 2, 2003, Plaintiff filed a Memorandum of Facts and Claims for Relief listing six claims for relief: (1) "Deliberate Indifference to Inmates Personal Security Interest;" (2)

"Intentional Interference With Inmate's Exhaustion of Grievance[sic], Denial of Access to Court;"
(3) "Conspiracy To Violate Inmate's Federal Constitutional Rights For Purpose[sic] of
Retaliation;" (4) "Deliberate Indifference to Inmate's Serious Medical Needs;" (5) "State Assault
Claim;" and (6) "State Battery Claim."  (Doc. No. 2).  The first four claims were made against
Defendants C. Terhune, Garcia, Houston, Butler, Edwards, Fasolo, Garcia, A. Terhune, Ormand,
Parker, and John Does 1-10.  Id.  Claims Five and Six were made against Defendants Pinney and
Osborn.  Id.

On May 21, 2004, Defendants filed a Motion to Dismiss Plaintiff's Complaint for: (1)
Failure to exhaust administrative remedies; (2) Failure to state a claim against Defendant C.
Terhune; and, (3) Failure to state a claim in regards to Plaintiff's classification and his medical
hardship transfer claims.  (Doc. No. 26).  On February 7, 2005, United States District Judge Roger
T. Benitez, granted in part and denied in part Defendants' Motion to Dismiss.  (Doc. No. 34).
Specifically, the Court: (1) Dismissed Plaintiff's Fourteenth Amendment claims as to Defendant
C. Terhune for failing to state a claim under a respondeat superior theory; (2) Dismissed Plaintiff's
Fourteenth Amendment claim based on failure to accurately calculate his classification score; and,
(3) Dismissed Plaintiff's Fourteenth Amendment claim based on denial of his request for a
hardship transfer.  Id.  The Court also dismissed, *sua sponte,* all claims against Defendants Warden
Silvia Garcia, Chief Deputy Warden R. Garcia, Correctional Officer Parker, Inmate Pinney,
Inmate Osborn and John Does 1-10.  Id.  The Court also denied Defendants' Motion to Dismiss
Plaintiff's Complaint for the failure to exhaust administrative remedies.  Id.  On February 22,
2005, Defendants filed their Answer.  (Doc. No. 35).

On March 15, 2006, Defendants filed a Motion for Summary Judgment arguing that:
(1) Plaintiff failed to show that the Defendants acted with deliberate indifference to his safety;
(2) Defendant C. Terhune was not personally involved and did not cause any violation to
Plaintiff's rights; and, (3) Defendants are entitled to qualified immunity.  (Doc. No. 50).  On July
10, 2006, Plaintiff filed an Opposition to the Defendants' Motion for Summary Judgment.  (Doc.
No. 75).  On July 17, 2006, Defendants filed a Reply to Plaintiff's Opposition.  (Doc. No. 77).

On July 25, 2006, Magistrate Judge Anthony J. Battaglia, issued an Order requiring

supplemental briefing regarding the impact on this case of the Supreme Court's decision in Woodford v. Ngo, 548 U.S. 81, 84 (2006).  (Doc. No. 78).  On August 2, 2006, Defendants filed a Supplemental Memorandum of Points and Authorities addressing the Order.  (Doc. No. 79).  The memorandum also addressed the first four claims in Plaintiff's Memorandum of Facts and Claims for Relief, because Defendants' original Motion for Summary Judgment did not address those claims directly.  See id; (Doc. No. 51).  On September 18, 2006, Plaintiff filed his Opposition to Defendants' Supplemental Memorandum of Points and Authorities.  (Doc. No. 81).  On September 20, 2006, Defendants filed a Reply to Plaintiff's Opposition.  (Doc. No. 83).

On September 27, 2006, Magistrate Judge Battaglia issued a Report and Recommendation recommending that Defendants' Rule 12(b) motion for failure to exhaust administrative remedies be granted, and finding the motion for summary judgement moot, which was adopted by Judge Benitez on November 28, 2006.  (Doc. No. 85; Doc. No. 89).

On December 21, 2006, Plaintiff filed an appeal of the adopted Report and Recommendation. (Doc. No. 90).  On October 5, 2009, the United States Court of Appeals for the Ninth Circuit reversed the District Court's 12(b) dismissal and remanded for a determination of Plaintiff's opportunity and ability to file a timely grievance.  (Doc. No. 100).

On November 19, 2009, Magistrate Judge Battaglia ordered supplemental briefing regarding the exhaustion of administrative remedies.  (Doc. No. 101).  On January 8, 2010, Magistrate Judge Battaglia clarified the order for supplemental briefing limiting its scope to Plaintiff's contention that he was unable to obtain and complete a grievance form before May 10, 2002, due to the harm he suffered during the stabbing attack by another inmate on April 7, 2002.  (Doc. No. 105).  On January 11, 2010, Defendants filed their Supplemental Briefing regarding exhaustion of administrative remedies.  (Doc. No. 106).  On March 1, 2010, Plaintiff filed an Affidavit in Opposition to Defendants Supplemental Briefing.  (Doc. No. 115).  On March 12, 2010, Defendants filed a Reply to Plaintiff's Affidavit in Opposition to Defendants' Supplemental Briefing.  (Doc. No. 116).  On January 7, 2011, Magistrate Judge Battaglia ordered supplemental briefing regarding: (1) Plaintiff's access to the 602 form and writing instrument during the relevant time period; and, (2) whether Plaintiff was administered any psychiatric medications during the

relevant time period.  (Doc. No. 119).  On January 24, 2011, Defendants filed an additional

Supplemental Briefing regarding the exhaustion of administrative remedies.  (Doc. No. 120).

## II.        FACTUAL BACKGROUND

The facts are taken from the parties' submissions and are not to be construed as findings of

fact by the Court.

On January 26, 2001, Plaintiff was transferred to Calipatria, a level IV prison facility.  (Doc.

No. 1 at 8).  Level IV facilities are rated as higher security facilities and house inmates considered

higher security risks.  See Cal. Admin. Code tit. 15, §§ 3377, 3375.3-3375.5.  Plaintiff claims, and

Defendants admit, that Plaintiff had a placement score of 50.  (Doc. No. 106 at 30).  According to

the California Code of Regulations, prisoners "with a placement score of 28-51 shall be placed in a

Level III facility."  Cal. Admin. Code tit. 15, § 3375.1.  Because Plaintiff's placement score fell

within level III guidelines Plaintiff claims he should have been transferred out of Calipatria.  (Doc.

No. 1 at 8).

On March 20, 2001, Plaintiff filed an Inmate Grievance Form ("602") requesting a transfer

due to his mis-classification, and hardship because of his distance from family.  (Doc. No. 1 at 15).

Defendant Edwards rejected the appeal because it had not been reviewed on the informal level.  Id.

at 25.  On May 25, 2001, Plaintiff's appeal was partially granted at the informal level.  Id. at 15.  It

is unclear who performed the informal review.  On August 9, 2001, Plaintiff was interviewed by

Defendant A. Terhune, a Correctional Counselor at Calipatria, concerning his requested transfer.

Id. at 18.  On September 11, 2001, A. Terhune partially granted Plaintiff's First Level Appeal

pending a hearing by the Unit Classification Committee ("UCC") concerning Plaintiff's requested

transfer.  Id.  Defendant Butler, a Captain at Calipatria, approved the partial granting of Plaintiff's

Appeal.  Id. at 16.  On October 18, 2001, Plaintiff's Second Level Appeal was partially granted by

Defendant Houston, Chief Deputy Warden at Calipatria.  Id. at 17.  The Second Level Review

indicated that Defendant Ormand, a Correctional Counselor at Calipatria, had reviewed Plaintiff's

inmate file and recommended that his annual review before the UCC be moved up to November

2001.  Id.  Plaintiff did not mention a safety concern in any appeals material dated earlier than

March 8, 2002.  (Doc. No. 1).

On March 8, 2002, Plaintiff sent his Third Level Appeal along with a letter to Sacramento for review. Id. at 19. In the letter dated March 8, 2002, Plaintiff again requested a transfer due to both his mis-classification and hardship. Id. An undated letter addressed to the Department of Corrections Inmate Appeals Branch in Sacramento was submitted with the letter dated March 8, 2002. Id. at 20. In the undated letter, Plaintiff reiterated his request for transfer,[1] asserted that a "war between whites and blacks" had broken out at Calipatria and that Plaintiff feared for his life. Id. Plaintiff said that believed himself to be in "immediate danger" and in need of a transfer. Id. Plaintiff's March 8, 2002, letter and a Third Level Review dated May 22, 2002, confirm that Plaintiff was scheduled to be transferred away from Calipatria. Id. at 14,19.

On December 2, 2001, "a racial war (riot) between the Black and White inmates occurred" at Calipatria. (Doc. No. 106 at 33). A Program Status Report indicates that after the riot white and black inmates were confined to their cells at all times, including meals, with the exception of "controlled showers." (Doc. No. 1 at 27). On December 18, 2001, black and white inmates were approved for escorts to showers without handcuffs, but were to shower at separate times. Id. That same day, Plaintiff informed Sergeant Hernandez, an employee at Calipatria, about continued racial tensions between white and black inmates. (Doc. No. 106 at 32). Plaintiff also identified "shotcallers," leaders of the white inmates. Id. Plaintiff warned that these shotcallers planned an attack in which several white inmates were to stab black inmates. Id. Plaintiff said that he did not want to participate in the attack and feared for his safety. (See Doc. No. 1 at 10).

On December 27, 2001, a black inmate was killed by white inmates. (Doc. No. 106 at 33). After the killing, all inmates were subject to lockdown procedures which included "unclothed body search[es]" and handcuffed escort when out of their cell. (Doc. No. 1 at 28). Lockdown

---

[1]Defendants appear to contend that this letter was also sent to Sacramento on March 8, 2002, along with Plaintiff's Third Level Appeal. (Doc. No. 51 at 15). In Plaintiff's Deposition, Plaintiff was separately asked by Defendants if the letter was dated March 2 and March 8, the Plaintiff answered affirmatively to both questions. (Doc. No. 53). In letters, attached to Plaintiff's Complaint, the Department of Corrections Inmate Appeals Branch indicate that they returned documents sent to them regarding Plaintiff's appeal in late 2001. (Doc. No. 1 at 23-24). Plaintiff seems to refer to these documents in his Memorandum of Facts and Claims for Relief and claims they "informed the Director of his fear of immediate danger to himself due to the racial riot." (Doc. No. 2 at 12). Plaintiff, further, parenthetically refers to the letter in his Memorandum of Facts and Claims for Relief and claims it was dated December, 28, 2001. (Doc. No. 2 at 13).

procedures appear to have been in effect until at least spring 2002.  A Program Status Report dated March 26, 2002, specifies that effective March 27, 2002, "inmates will no longer be handcuffed to and from showers but will submit to a clothed body search prior to exiting their cells."  (Doc. No. 59 at 5).

According to Plaintiff, during 2001-02, Correctional Officer Parker was in charge of collecting outgoing mail.  (Doc. No. 1 at 10).  Plaintiff claims that Parker would read the mail and report any relevant information to the white inmate shotcallers who would order retaliatory assaults against informers.  Id.  Plaintiff further claims that Parker intercepted a message containing expressions of Plaintiff's fears and reluctance to attack black inmates.  Id.

On April 7, 2002, Plaintiff, who is white, was attacked in the shower by white inmates Pinney and Osborn.  Id.  Plaintiff received stab wounds to the chest, arms, and hand.  (Doc. No. 106 at 18).  Plaintiff claims that unnamed Corrections Officers violated the procedures of the lockdown.  (Doc. No. at 10).  Plaintiff claims that officers did not search Plaintiff's attackers, and allowed them out of their cells while out of handcuffs and unsupervised.  Id.  Further, Plaintiff alleges that Osborn was released from his cell specifically to participate in the attack.  (See Doc. No. 2 at 16).  After the attack, Plaintiff was transferred to a local emergency room.  (See Doc. No. 106 at 30).  He remained at the hospital until April 9, 2002, when he returned to Calipatria.  Id.

Between April 9, 2002, and April 22, 2002, Plaintiff was housed in the prison's Outpatient Housing Unit/infirmary ("OHU").  (See Doc. No. 115).  During his stay in the OHU plaintiff received several medications to treat his wounds and corresponding pain. (Doc. No. 106  at 25-27).  Plaintiff was prescribed Keflex (antibiotic), Ibuprofen, and Tylenol #3.  Id.  Tylenol #3 contains both acetaminophen to reduce pain and fever, and codeine, a narcotic used to treat pain.  (Doc. No. 106-2).  Side effects of Tylenol #3 were described in declarations attached to Defendants Motion for Summary Judgement as dizziness, light-headedness, nausea, and vomiting.  Id.  The record indicates that Plaintiff was prescribed Tylenol #3 on April 10, 12, and 14; each prescription was for two day dosages.  (Doc. No. 106 at 19).  If Plaintiff followed the prescriptions, he would have taken Tylenol #3 during the period of April 10, 2002, until April 15, 2002.  See id.  Although Plaintiff's recovery was described as unremarkable by prison staff, Plaintiff stated that he was still

in some shock and unable to think rationally or clearly.  (Doc. No. 115).

Plaintiff was placed on Administrative Segregation ("AdSeg") on April 7, 2002, and was given notice of his placement on April 9, 2002.  (Doc. No. 106 at 28, 35).  Plaintiff describes AdSeg as a disciplinary status "which meant no contact, no property, and no writing materials." (Doc. No. 115).  On April 11, 2002, Plaintiff was interviewed about his attack.  (Doc. No. 106 at 32).  On April 12, 2002, Plaintiff signed a confidential memorandum based on the interview indicating that he had reviewed it for accuracy.  Id.  Also on April 12, 2002, Plaintiff was seen by the Institutol Classification Committee ("ICC") to determine his housing placement.  Id. at 30. The Committee recommended he stay in the OHU on AdSeg status.  Id.  On April 18, 2002, Plaintiff was again seen by the ICC.  Id. at 35.  Plaintiff requested and was granted sensitive-needs placement.  Id.  On April 22, 2002, Plaintiff was released from the OHU to the Sensitive Needs Yard.  (Doc. No. 115).  On May 10, 2002 Plaintiff filed a 602 regarding the stabbing incident. (Doc. No. 1 at 38).  On June 23, 2002, Plaintiff's appeal was screened out as untimely.  Id.  On July 27, 2002, Plaintiff received his denied appeal and responded: "I was stabbed April 7, I was in the hospitol[sic] and in the infirmary and had no access to any proper forms or writing material to file this.  I was badly hurt and when I received access I filed a complaint as quickly as possible." Id.  On September 8, 2002, Plaintiff wrote directly to the Director of Corrections claiming corruption at Calipatria for the denial of his appeal.  (Doc. No. 1 at 42).

On November 2, 2006 Denise Edwards signed a sworn declaration stating the she routinely visited areas of Calipatria in 2002 to confirm that 602 forms were available to inmates, including the OHU.  (Doc. No. 106 at 56).  Further, that it was institutional policy in 2002 to make 602 forms readily accessible to inmates or available upon request in lockdown units.  Id.

On February 24, 2010, Plaintiff signed a sworn declaration that is unclear as to whether Plaintiff had access to 602 forms or writing instruments between April 7, and May 10, 2002. (Doc. No. 115).  He does state that while housed in the OHU he was not allowed writing materials and 602 forms even upon request.  Id.  Further, he states that between April 22 and April 30 he continued to ask for 602 and Notice of Rights and Responsibilities forms.  Id.  Plaintiff claims that he "could not get the Notice," but does not mention access to the 602 during this period.  Id.

1     Plaintiff also claims that he could not access information regarding his assault during that period.

2     Id.  Plaintiff did not address his access to forms between May 1 and May 10, 2002.  See id.  On

3     May 10, Plaintiff "finally obtained a 602 and a Notice."  Id.  Plaintiff filed his 602 and Notice that

4     day.  (Doc. No. 106 at 37).

5        On January 19, 2011, M. Ormand signed a sworn declaration stating that "As an inmate in

6     the Outpatient Housing Unit in April 2002, inmate Marella had access to a writing instrument and

7     602 forms and would have been permitted to file an inmate appeal."  (Doc. No. 120-2).  Ormand

8     was a Correctional Counselor at Calipatria in 2002, and claims a familiarity with conditions and

9     privileges in the OHU in 2002.  Id.  Ormand also states that even inmates in the OHU on AdSeg

10    status are provided appeals forms and writing instruments.  Id.

11         **III.**         **DISCUSSION**

12        Because this case comes before the Court on remand from the Ninth Circuit with instructions

13    to address a specific question, the Court will address this first.  The threshold question is whether

14    Plaintiff had both the ability and opportunity to file a timely grievance following his stabbing

15    attack by another inmate.  If the Plaintiff did not have the ability and opportunity to file a timely

16    grievance his claim cannot be defeated for failure to exhaust administrative remedies.  Marella v.

17    Terhune, 568 F.3d 1024, 1027 (9th Cir. 2009).

18         **A.**         **NONENUMERATED MOTION TO DISMISS**

19        In ruling on a motion for summary judgment the Court should not resolve any material

20    factual issue.  See Fed. R. Civ. P. 56.  If there is such an issue it should be resolved at trial.  Id.

21    However, when "a factual issue arises in connection with a jurisdictional or related type of motion,

22    the general view is that there is no right of jury trial as to that issue ... and that the Court has a

23    broad discretion as to the method to be used in resolving the factual dispute."  Ritza v. Int'l

24    Longshoremen's & Warehousemen's Union, 837 F.2d 365, 369 (9th Cir. 1988).

25        The Ninth Circuit has held that "failure to exhaust nonjudicial remedies is a matter in

26    abatement, not going to the merits of the claim, and as such is not properly raised in a motion for

27    summary judgment."  Id. at 368.  However, "when a defendant files a summary judgment motion

28    that raises the issue of exhaustion of non-judicial remedies, the motion should be treated as a

1   'nonenumerated' motion to dismiss under Federal Rule of Civil Procedure 12(b)."  Irvin v.

2   Zamora, 161 F. Supp. 2d 1125, 1128 (S.D. Cal. 2001) (citing Ritza, 837 F. 2d. at 368-69).

3   Because Defendants claim that Plaintiff failed to exhaust his administrative remedies, this Court

4   will treat the Defendants' Motion for Summary Judgment as a nonenumerated motion under

5   Federal Rule 12(b), rather than a summary judgment motion pursuant to Federal Rule 56, when

6   considering that claim.

7        However, when presented with a motion to dismiss for a failure to exhaust non-judicial

8   remedies the standard of review is broadened beyond the normal scope of 12(b).  See Wyatt v.

9   Terhune, 315 F.3d 1108, 1119-20 (9th Cir. 2003).  In deciding a motion to dismiss for a failure to

10   exhaust non-judicial remedies the Court may look beyond the pleadings and decide disputed issues

11   of fact.  Id.  Further, "no presumptive truthfulness attaches to plaintiff's allegations, and the

12   existence of disputed material facts will not preclude the trial Court from evaluating for itself the

13   merits of jurisdictional claims."  Ritza, 837 F. 2d. at 369.

14        **B.**      **EXHAUSTION OF ADMINISTRATIVE REMEDIES**

15        The Prison Litigation Reform Act of 1995 provides that "no action shall be brought with

16   respect to prison conditions under § 1983 . . . by a prisoner confined in any jail, prison, or other

17   correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C.

18   § 1997e(a).  Exhaustion is no longer left to the discretion of district courts and is a mandatory

19   requirement for all § 1983 actions.  Woodford, 548 U.S. at 85.  Exhaustion requires that a plaintiff

20   has been in "compliance with an agency's deadlines and other critical procedural rules" before

21   having a remedy in federal Court.  See id. at 90.

22        The Ninth Circuit has held that the PLRA exhaustion requirement is an affirmative defense

23   that must be raised and proved by the defendant.  Wyatt, 315 F.3d at 1112.  Thus, the burden of

24   establishing nonexhaustion is placed on defendants.  See id.  Relevant evidence to demonstrate

25   nonexhaustion includes "statutes, regulations, and other official directives that explain the scope of

26   the administrative review process; documentary or testimonial evidence from prison officials who

27   administer the review process; and information provided to the prisoner concerning the operation

28   of the grievance procedure in this case."  Brown v. Valoff, 422 F.3d 926, 937 (9th Cir. 2005).

The California prison system's requirements "define the boundaries of proper exhaustion." See Jones v. Bock, 549 U.S. 199, 218 (2007). In 2002, California had a four step appeals process:

(1) "In order to exhaust administrative remedies, a prisoner must first attempt to informally resolve the problem with the staff member involved in the action or decision being appealed." Cal. Code Regs. tit. 15 § 3084.5(a).

(2) If unsuccessful, the prisoner must then submit a formal appeal on an inmate appeal form (a "602") to the institution's Appeals Coordinator or Appeals Office. Id. § 3084.5(b).

(3) If the prisoner is again unsuccessful, he or she must submit a formal appeal for second level review, which is conducted by the institution head or designee. Id. §§ 3084.5(c), 3084.5(e)(1).

(4) The third or "Director's Level" of review "shall be final and exhausts all administrative remedies available in the Department [of Corrections]." See Cal. Dep't. of Corrections Operations Manual, § 54100.11.

In 2002[2], in order to initiate an appeal, an inmate needed to begin the complaint process within 15 working days of the incident or action subject to complaint. Cal. Code Regs. tit. 15 § 3084.6(c). The appeals coordinator is only permitted to reject an appeal if "[t]ime limits for submitting the appeal are exceeded and the appellant had the opportunity to file within the prescribed time constraints." Cal. Code Regs. tit. 15 §§ 3084.6(c) and 3084.3(c)(6). The California Department of Corrections and Rehabilitation Operating Manual directs the appeals coordinator to "ensure that the inmate or parolee had, in fact, the opportunity to file in a timely manner." Section 54100.8.1. Thus, "the prison's regulations explicitly create an exception to the timely filing requirement." Marella v. Terhune, 568 F.3d 1024, 1027 (9th Cir. 2009). An inmate must have both the ability and the opportunity to file an appeal within the fifteen-day filing period. See id.

**1.      Plaintiff had the ability to file a timely 602 grievance.**

If a Plaintiff did not have the ability to file an appeal within the time-frame mandated by the

---

[2]California regulations have since been amended. *See* Cal. Code Regs. tit. 15 § 3084.8(b). However, the Court need not address those changes and will focus on the procedure in place at the time Plaintiff was required to file his appeal.

state, he will not lose his right to be heard in federal Court.  See id.  Plaintiff, in his affidavit  in

opposition to Defendants' Motion to Dismiss, claims that he did not have the ability to file a 602

form within the fifteen working days required by California prisons in 2002.  (Doc. No. 115).

During his stay at the hospital, immediately after his attack, Plaintiff claims that "[b]ecause of the

medications, shock, and pain, [he] was not really aware of what was going on," and was in no

condition to fill out paperwork.  Id.  Plaintiff's hospital stay lasted no more than three days.  Id.

Plaintiff was then moved to the OHU, where he was prescribed antibiotics and pain-killers.

Id.  Plaintiff claims he was still in "some shock," and was bedridden for two weeks and could not

move around.  Id.  Previously, in Plaintiff's Opposition to the Supplemental Briefing by

Defendants, Plaintiff claimed that during his stay in OHU the pain and medication administered

caused him to be "unable to think clearly and/or rationally about running right out to file an inmate

appeal in a timely manner."  (Doc. No. 81).  Further, Plaintiff stated that he filed his appeal as

soon as physically possible.  Id.  Plaintiff also argued that he was not physically able to file his 602

in his appeal to the Ninth Circuit.  Appellant's Opening Brief, 2008 WL 647469.  The Plaintiff

framed his argument around the question of whether "in his injured and medicated state" he had

access to 602 forms.  Id.  Plaintiff remained in the OHU until released to the special needs yard on

April 22, 2002.  (Doc. No. 115).

Defendants claim that Plaintiff's injuries and treatment were not severe enough to seriously

impair his ability to file a timely appeal.  Defendants provide the medical opinion of Dr.

Beregovskaya as evidence that Plaintiff had the ability to fill out a 602 from.  (Doc. No. 106-2).

Dr. Beregovskaya reviewed Plaintiff's medical records and stated that:

> [I]n my professional opinion, Marella's injuries and overall general physical
> condition was not severe enough to incapacitate him from requesting, filling
> out, and submitting an administrative grievance form[602].  The only drug
> administered to Mr. Marella that could have potentially effected his mental
> state was Tylenol #3.  However, Mr. Marella only received it for three days
> and the dose was minimal.  Therefore, in my professional medical opinion,
> I do not believe the medication regimen Mr. Marella received including
> Tylenol #3, would have prevented him from requesting, filling out, and
> submitting an administrative grievance form.

Id.  Plaintiff did not directly address the medical opinions of Dr. Beregovskaya in his Opposition.

(Doc. No. 115).

Although the record indicates that Plaintiff was prescribed Tylenol #3 for a period of six days, rather than three days as stated by Dr. Bergovskaya, it does not appear that Plaintiff was physically or mentally unable to file a timely grievance form.  (See Doc. No. 106 at 19).  Plaintiff was physically and mentally able to be interviewed about his attack on both April 10 and April 11, 2002.  He was physically and mentally able to sign both his notice of AdSeg status on April 9, 2002, and the confidential memorandum based on his interview on April 12.  Further, Plaintiff was physically and mentally able to twice appear before the ICC.  Plaintiff's participation with the administrative procedures of the prison along with the medical opinion of Dr. Beregovskaya demonstrate that Plaintiff was physically and mentally able to fill out a 602 form during his stay in the OHU.  Plaintiff does not claim that he lacked the physical or mental ability to fill out a 602 after his release from the OHU.  Therefore, this Court finds that Plaintiff had the ability to file a timely appeal.

### 2.      Defendants failed to meet the burden of proving that Plaintiff had the opportunity to file a timely 602 grievance.

Even when an inmate has the mental and physical ability to file a timely appeal, he or she must also have the opportunity to do so.  See Marella, 568 F.3d at 1027.  The ability to file is determined by the mental and physical condition of the inmate, while the opportunity to file is determined by the availability of the grievance process..  If an inmate fails to file an appeal timely due to the lack of the opportunity to do so, the Court cannot bar his claim for the nonexhaustion of administrative remedies.  Id.  Defendants have the burden of proving nonexhaustion.  Wyatt, 315 F.3d at 1112.  Accordingly, although the Court has found that Plaintiff had the physical and mental ability to fill out an appeals form, Defendants must prove that the Plaintiff also had the opportunity to fill out the appeals form.  See Marella, 568 F.3d at 1027.

Plaintiff has consistently claimed that 602 forms were not available to him while in the hospital, OHU, and during AdSeg status.  In his written response to the denial of his first formal appeal due to failing to file timely, Plaintiff claimed that while in the hospital and OHU he "had no access to proper forms or writing material[s]."  (Doc. No. 1 at 38).  In the Memorandum of Facts and Claims for Relief submitted by the Plaintiff with his Complaint, Plaintiff claimed that he was "denied access to proper forms required to file a staff misconduct complaint."  (Doc. No. 2 at 19).

In his appeal to the Ninth Circuit, Plaintiff again argued that he lacked access to the proper forms and writing materials. See Appellant's Opening Brief, 2008 WL 647469. Plaintiff only made generalized statements about his lack of access until February 2010.

In Plaintiff's affidavit in opposition to Defendants' Motion to Dismiss, Plaintiff makes his first specific accusations. (Doc. No. 115). Plaintiff claims that he was informed by a Correctional Officer that pencils were not given out in the infirmary. Id. Plaintiff claims that because he was aware of a short deadline for filing appeals he twice asked correctional officers for 602 forms. Id. On neither occasion was he provided with a form. Id. Plaintiff further claims that, after his release from the OHU, between April 22 and April 30, 2002, he requested 602 and Notice of Rights and Responsibilities and "could not get the Notice." Id. Plaintiff does not mention if he had access to a 602 during that time. Plaintiff also remained silent about his access to forms between May 1 and May 10, 2002.

Defendants argue that the claims made in Plaintiff's affidavit in opposition to Defendants' Motion to Dismiss should not be believed because they are of recent vintage and brought forth at this time only in response to evidence provided by Defendants. Defendants have submitted several sworn declarations in support of its claim that Plaintiff had access to appeals forms both during and after his stay in OHU. Denise Edwards signed a sworn declaration stating the she routinely visited areas of Calipatria in 2002 to confirm that 602 forms were available to inmates, including the OHU. (Doc. No. 106 at 56). She also stated that it was institutional policy in 2002 to make 602 forms readily accessible to inmates or available upon request in lockdown units. Id.

M. Ormand signed a sworn declaration stating that "As an inmate in the Outpatient Housing Unit in April 2002, inmate Marella had access to a writing instrument and 602 forms and would have been permitted to file an inmate appeal." (Doc. No. 120-2). Ormand was a Correctional Counselor at Calipatria in 2002, and claims a familiarity with the conditions and privileges in the OHU in 2002. Id. Ormand also states that even inmates in the OHU on AdSeg status are provided appeals forms and writing instruments. Id.

Defendants argue that the testimony of prison officials, balanced against Plaintiff's changing story, should persuade the Court to conclude that Plaintiff had the opportunity to file a 602 form

1    during and after his stay in OHU.  (Doc. No. 116).  Although the Court appreciates that specific

2    allegations of lack of access to 602 forms are only lately presented by Plaintiff, his statement, like

3    the evidence provided by Defendants, was given under oath.  The burden to prove nonexhaustion

4    lies with Defendants.  Wyatt, 315 F.3d at 1112.  Because the Court is left with competing sworn

5    claims, Defendants have failed to meet the burden of proving that Plaintiff had the opportunity to

6    file a timely 602 grievance.

7         **3.**    **Conclusion**

8         In order for his administrative remedies to be exhausted, due to untimely filing, an inmate

9    must have both the ability and opportunity to file an appeal within a filing period mandated by the

10   state.  Marella, 568 F.3d at 1027.  Defendants have failed to prove that Plaintiff had the

11   opportunity to file a timely 602 appeal form.  Because Defendants were unable to prove that

12   Plaintiff had both the ability and opportunity to file a timely appeal, Defendants have not proven

13   that Plaintiff failed to exhaust his administrative remedies before filing suit with this Court.  See

14   id.  Consequently, the motion for summary judgment is not moot.  The Court will now address

15   Defendants' Motion for Summary Judgment.  (Doc. No. 50).

16        **C.**    **SUMMARY JUDGMENT**

17        Summary judgment is proper when "there is no genuine issue as to any material fact and that

18   the moving party is entitled to a judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S.

19   317, 322 (1986).  The party seeking summary judgment bears the initial burden of demonstrating

20   to the Court that summary judgment is appropriate.  Id. at 323.  The burden then shifts to the non-

21   moving party to provide evidence beyond the pleadings that shows that summary judgment is

22   inappropriate.  Id. at 322-24.  The non-moving party must set forth specific facts showing that

23   there is a genuine issue for trial, and "may not rest upon mere allegation or denials of his

24   pleading."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  The mere existence of

25   some alleged factual dispute between the parties "will not defeat an otherwise properly supported

26   motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."

27   Id. at 247-248.

28        A fact or issue is genuine "if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." <u>Villiarimo v.Aloha Island Air, Inc.</u>, 281 F.3d 1054, 1061 (9th Cir. 2002) (internal quotation and citation omitted). However, when the only evidence presented is uncorroborated and self-serving testimony, the Ninth Circuit has refused to find a genuine issue. See <u>id.</u>

"As to materiality, the substantive law will identify which facts are material." <u>Anderson</u>, 477 U.S. at 248. Only factual disputes that might affect the outcome of the suit will properly preclude the entry of summary judgment. <u>Id.</u> At the summary judgment stage a trial judge is not required make findings of fact. <u>Id.</u> at 250. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial - whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Id.</u>

At this stage, the Court may not weigh evidence or make credibility determinations. <u>Bator v. State of Hawaii</u>, 39 F.3d 1021, 1026 (9th Cir.1994). On summary judgment, "the inferences to be drawn from the underlying facts contained in the moving party's materials must be viewed in the light most favorable to the party opposing the motion." <u>Adickes v. S. H. Kress & Co.</u>, 398 U.S. 144, 158-159 (1970). Further, when a plaintiff proceeds *pro se*, especially a prisoner, his pleadings should be construed broadly by the Court. See <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007). "However, in construing *pro se* petitions liberally, the petitioner is not entitled to the benefit of every conceivable doubt; the Court is obligated to draw only reasonable factual inferences in the petitioner's favor." <u>Porter v. Ollison</u>, 620 F.3d 952, 958 (9th Cir. 2010).

Plaintiff has four remaining claims: (1) That Defendants were deliberately indifferent by failing to protect Plaintiff from attack; (2) That Defendants intentionally interfered with Plaintiff's access to the Courts; (3) That Defendants conspired to violate Plaintiff's constitutional rights; and, (4) That Defendants were deliberately indifferent to Plaintiff's medical needs. The Court will address each in turn.

**1.      DELIBERATE INDIFFERENCE: FAILURE TO PROTECT**

Plaintiff's first claim names Defendants C. Terhune, Houston, Butler, Edwards, Fasolo, A. Terhune, and Ormand. (Doc. No. 2). Plaintiff claims that each Defendant was deliberately

1  indifferent to his "personal security interest." Id. Essentially, Plaintiff claims that Defendants are

2  liable for their failure to protect him from attack.

3     A prisoner has a valid cause of action under § 1983 when a constitutional right of the

4  prisoner has been violated under color of law. See 42 U.S.C. 1983. "The Constitution does not

5  mandate comfortable prisons, but neither does it permit inhumane ones, and it is now settled that

6  the treatment a prisoner receives in prison and the conditions under which he is confined are

7  subject to scrutiny under the Eighth Amendment." Farmer v. Brennan, 511 U.S. 825, 833 (1994)

8  (internal quotations and citation omitted). The Eighth Amendment prohibits "cruel and unusual

9  punishments." U.S. CONST. amend. VIII. "To violate this constitutional proscription, the

10 punishment must be incompatible with the evolving standards of decency that mark the progress of

11 a maturing society, or must involve unnecessary or wanton pain disproportionate to the severity of

12 the crime." Berg v. Kincheloe, 794 F.2d 457, 459 (9th Cir. 1986) (internal quotation and citation

13 omitted).

14    The Eighth Amendment imposes duties on prison officials, including the duty to "take

15 reasonable measures to guarantee the safety of the inmates." Farmer, 511 U.S. at 832. "A prison

16 authority need not brandish a gun or employ a billy club to transgress the evolving standards of

17 decency." Berg, 794 F.2d at 460. Thus, prison officials have a duty to protect prisoners from

18 violence at the hands of other prisoners. Farmer, 511 at 833. "The failure of prison officials to

19 protect inmates from attacks by other inmates may rise to the level of an Eighth Amendment

20 violation when: (1) The deprivation alleged is objectively, sufficiently serious; and, (2) The prison

21 officials had a sufficiently culpable state of mind, acting with deliberate indifference." Hearns v.

22 Terhune, 413 F.3d 1036, 1040 (9th Cir. 2005) (internal quotation and citation omitted).

23    "[D]eliberate indifference entails something more than mere negligence ... [but] is satisfied

24 by something less than acts or omissions for the very purpose of causing harm or with knowledge

25 that harm will result." Farmer, 511 at 835. "It is . . . fair to say that acting or failing to act with

26 deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of

27 recklessly disregarding that risk." Id. at 836. A prison official cannot violate the Eighth

28 Amendment by denying an inmate humane conditions of confinement unless the official knows of

and disregards an excessive risk to inmate health or safety.  Id. at 837.  "The official must both be

aware of facts from which the inference could be drawn that a substantial risk of serious harm

exists, and he must also draw the inference."  Id.  "The standard does not require that the guard or

official believe to a moral certainty that one inmate intends to attack another at a given place at a

time certain before that officer is obligated to take steps to prevent such an assault."  Berg, 794

F.2d at 459 (internal quotation and citation omitted).  However, "he must have more than a mere

suspicion that an attack will occur."  Id.

　　　　Plaintiff states that "[i]n acting or failing to act as alleged in [his] complaint" Defendants

were deliberately indifferent to Plaintiff's safety.  (Doc. No. 2).  Plaintiff makes the general claim

that all Defendants "knew, or reasonably should have known" that all Level IV prison inmates

generally posed a threat to Plaintiff specifically because of those inmate's history of violence.  Id.

Further, Plaintiff claims that each named Defendant had knowledge that Plaintiff was in "serious

danger" from inmates Pinney and Osborn.  Id.  Plaintiff does not provide any evidence that

demonstrates why Defendants should have known that any particular inmate was a serious threat

to Plaintiff.  Defendants admit that, at the time Plaintiff was stabbed, "the staff at Calipatria was

aware of racial tensions between African-American and Caucasian inmates and these inmates were

on lockdown status with special precautionary measures."  (Doc. No. 51 at 9).  However,

Defendants claim that no Defendant was aware that Plaintiff, a Caucasian, was in any danger from

another Caucasian inmate.  Id.  Both of Plaintiff's assailants, inmates Pinney and Osborn, are

Caucasian.  Plaintiff has not refuted Defendants' claim with any evidence.

　　　　It is undisputed that no remaining Defendant was present at the time of Plaintiff's attack.

Plaintiff only claims that each Defendant was deliberately indifferent to Plaintiff's safety due to

their various roles in the appeals process.

　　　　Defendant Edwards was an Appeals Coordinator at Calipatria during the time immediately

preceding, and following, Plaintiff's attack.  (Doc. No. 2).  On March 20, 2001, Edwards denied

Plaintiff's hardship transfer 602 because he had not conducted an informal review.  (Doc. No. 1 at

25).  In his appeals form Plaintiff did not indicate that there was a specific threat to his safety, nor

did he express even a general safety concern.  Id. at 15.  Plaintiff's only contention regarding

Edwards, that pre-dates his attack, is that Edwards denied his hardship transfer 602. Plaintiff provides no evidence that Edwards was aware of any risk to Plaintiff's safety. In a sworn declaration dated April 14, 2006, Edwards states that Plaintiff expressed no safety concerns, and if he had "either in his appeal or to me personally," she would have investigated the concern and arranged for protective measures. (Doc. No. 54). Because Plaintiff has not provided the Court with any evidence to counter the sworn declaration of Edwards, the Court finds summary judgment appropriate regarding Plaintiff's claim that Edwards violated Plaintiff's Eighth Amendment right by failing to protect Plaintiff from attack. See Celotex, 477 U.S. at 322; Berg, 794 F.2d at 459.

Defendant Fasalo was a Litigation Coordinator at Calipatria until October 2001. (Doc. No. 55). Beginning in October 2001, Fasalo was an Appeals Coordinator at Calipatria. Id. Plaintiff only mentions Fasalo by name three times in his submissions to the Court. All three post-date his attack. Plaintiff provides no further evidence regarding Fasalo. In a sworn declaration dated April 14, 2006, Fasalo states that she was not aware of any safety concerns expressed by Plaintiff. (Doc. No. 55). Further, as a Litigation Coordinator at the time of Plaintiff's first appeal she would not have been in a position to review it, even if it had expressed a concern. Id. Because Plaintiff has not provided the Court with any evidence to counter the sworn declaration of Fasalo the Court finds summary judgment appropriate regarding Plaintiff's claim that Fasalo violated Plaintiff's Eighth Amendment right by failing to protect Plaintiff from attack. See Celotex, 477 U.S. at 322; Berg, 794 F.2d at 459.

Defendant A. Terhune was a Correctional Counselor II at Calipatria. On August 9, 2001, A. Terhune interviewed Plaintiff prior to his first level review of his 602 appeal regarding a hardship transfer. (Doc. No. 1 at 18). Aside from general allegations Plaintiff attributes to all Defendants, Plaintiff only identifies two acts of A. Terhune, the above-mentioned interview and a signature on Plaintiff's First Level Review. (Doc. 2). Plaintiff provides no further evidence regarding A. Terhune. In a sworn declaration dated April 14, 2006, A. Terhune states that Plaintiff did not report any safety concerns during the interview. (Doc. No. 56). A. Terhune also states that Plaintiff's First Level Appeal did not note any safety concerns. Id. Further, he claims that he did

not receive any written correspondence from Plaintiff noting any safety concerns, nor did Plaintiff ever speak to him relating to any safety concerns.  Id.  Because Plaintiff has not provided the Court with any evidence to counter the sworn declaration of A. Terhune the Court finds summary judgment appropriate regarding Plaintiff's claim that A. Terhune violated Plaintiff's Eighth Amendment right by failing to protect Plaintiff from attack.  See Celotex, 477 U.S. at 322; Berg, 794 F.2d at 459.

Defendant Houston was the Acting Chief Deputy Warden from May 2001 to July 2002. (Doc. No. 57).  He signed Plaintiff's Second Level Review partially granting Plaintiff's appeal and moving Plaintiff's annual review up to November 2001.  (Doc. No. 1 at 17).  In a sworn declaration dated April 14, 2006, he states that Plaintiff did not express any safety concerns, nor did Plaintiff identify any specific enemies to Houston.  (Doc. No. 57).  Houston admits that there was racial tension at Calipatria and that as acting Warden in December 2001 he instituted lockdown procedures, including handcuffed escorts.  Id.  Houston's declaration and a Program Status Report, dated March 26, 2002, indicate that handcuffs were no longer mandatory for inmate escorts as of March 27, 2002.  (Doc. No. 57; Doc. No. 59 at 5).  Plaintiff mentions Houston by name four times in his Memorandum of Facts and Claims for Relief, each refers either to the Second Level Review or the lockdown procedures Houston admits to ordering.  (Doc. No. 2). Because Plaintiff provides no further evidence as to how, or why, Houston would have been aware of a danger to Plaintiff from inmates Pinney and Osborn the Court finds summary judgment appropriate regarding Plaintiff's claim that Houston violated Plaintiff's Eighth Amendment right by failing to protect Plaintiff from attack.  See Celotex, 477 U.S. at 322; Berg, 794 F.2d at 459..

Defendant Ormand was a Correctional Counselor where Plaintiff was housed from February 2001 through April 2002.  (Doc. No. 58).  Ormand is mentioned twice in Plaintiff's Memorandum of Facts and Claims for Relief.  (Doc. No. 2).  Plaintiff claims that Ormand reviewed his central file in September 2001, and reported the findings for Plaintiff's Second Level Review.  Id. Plaintiff asserts that those findings prompted an order for Ormand to bring Plaintiff before the UCC in November 2001, to review his hardship transfer request.  Id.  Ormand does not dispute those facts.  (See Doc. No. 58).  In a sworn declaration dated April 14, 2006, Ormand states that

1   Plaintiff did not express any safety concerns in either interview with Ormand, or in two separate

2   UCC meetings held with Plaintiff that Ormand attended.  Id.  Because Plaintiff does not provide

3   any evidence that Ormand had knowledge of a threat to Plaintiff's safety, the Court finds summary

4   judgment appropriate regarding Plaintiff's claim that Ormand violated Plaintiff's Eighth

5   Amendment right by failing to protect Plaintiff from attack.  See Celotex, 477 U.S. at 322; Berg,

6   794 F.2d at 459.

7        Defendant Butler was a Captain at Calipatria during Plaintiff's stay there.  (Doc. No. 60).

8   Butler is mentioned three times in Plaintiff's Memorandum of Facts and Claims for Relief.  (Doc.

9   No. 2).  Plaintiff claims that Butler signed the First Level Review partially granting his request for

10  a hardship transfer.  Id.  Further, Plaintiff claims that Butler was aware of the racial tension at

11  Calipatria and the lockdown procedures in place due to the racial tension.  Id.  Butler does not

12  dispute those facts.  (See Doc. No. 60).  In a sworn declaration, Butler claims that Plaintiff never

13  expressed any safety concern either orally or in writing to him.  Id.  Because Plaintiff provides no

14  evidence as to how, or why, Butler would have been aware of a specific risk to Plaintiff's safety

15  the Court finds summary judgment appropriate regarding Plaintiff's claim that Butler violated

16  Plaintiff's Eighth Amendment right by failing to protect Plaintiff from attack.  See Celotex, 477

17  U.S. at 322; Berg, 794 F.2d at 459.

18       Defendant C. Terhune was the Director of Corrections during the time addressed in

19  Plaintiff's Complaint.  (Doc. No. 2).  Plaintiff claims that C. Terhune received Plaintiff's Third

20  Level Review.  Id.  Defendants claim that Third Level reviews in 2001-2002 were received and

21  reviewed by Linda Rianda, not C. Terhune.  (Doc. No. 51).  Defendants quote from a deposition

22  given by Plaintiff, and in the quote it would appear that Plaintiff was not certain who was in charge

23  of third level appeals.  Id.  Plaintiff also contends that C. Terhune should have known about

24  Plaintiff's safety concerns due to receiving an undated letter, a copy of which is attached to

25  Plaintiff's Complaint.  (Doc. No. 1 at 20).  As stated above, it is not clear when this letter was

26  drafted, when it was sent, or who received it.  There is some evidence suggesting that the letter

27  may have been returned to Plaintiff by Linda Rianda on either November 27, 2001, or January 7,

28  2002.  Id. at 23-24.  There is no evidence that suggests that C. Terhune personally read the letter.

1   Because Plaintiff has provided no evidence that C. Terhune was aware of any danger to Plaintiff

2   the Court finds summary judgment appropriate regarding Plaintiff's claim that C. Terhune violated

3   Plaintiff's Eighth Amendment right by failing to protect Plaintiff from attack.  See Celotex, 477

4   U.S. at 322; Berg, 794 F.2d at 459.

5        Because there is no evidence that any particular Defendant had knowledge of a specific

6   threat to Plaintiff's safety prior to his stabbing by inmates Pinney and Osborn, the acts or

7   omissions of Defendants do not rise to the level of deliberate indifference.  See Farmer, 511 at 837.

8   Plaintiff has failed to demonstrate the culpable state of mind necessary to make any Defendant

9   liable for the alleged violation of his Eighth Amendment rights due to the denial of humane

10  conditions of confinement.  Hearns, 413 F.3d at 1040.

11       Plaintiff also alleges that "every Defendant" through "their failure to train, supervise,

12  discipline and/or otherwise control" all actions outlined in the complaint, violated his Eighth

13  Amendment rights.  (Doc. No. 75 at 3).  Plaintiff has not provided evidence that would

14  demonstrate what role any particular Defendant played in the training and supervision of any

15  person who would be in a position to affect his conditions of confinement.  In any event, even if

16  the Court were to assume that each Defendant was in a supervisory position, Plaintiff has not

17  provided evidence that would show that any Defendant was deliberately indifferent to Plaintiff's

18  allegedly dangerous conditions of confinement.  See Starr v. Baca, --- F.3d ----, 2011 WL 2988827

19  *4-5 (9th Cir. 2011).

20       Plaintiff's claim is based on a theory of supervisory liability.  However, "vicarious liability is

21  inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant,

22  through the official's own individual actions, has violated the Constitution."  Ashcroft v. Iqbal, 129

23  S.Ct. 1937, 1948 (2009).  "Government officials may not be held liable for the unconstitutional

24  conduct of their subordinates under a theory of respondeat superior."  Id.  The Ninth Circuit has

25  developed a theory of direct liability based on the supervisor's "training, supervision, or control of

26  his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed

27  a reckless or callous indifference to the rights of others."  See Starr, 2011 WL 2988827 at *5.  In

28  order to show deliberate indifference, "a plaintiff may state a claim against a supervisor . . . based

1   upon the supervisor's knowledge of and acquiescence in unconstitutional conduct by his or her

2   subordinates." Id. at *4. "A defendant may be held liable as a supervisor under § 1983 if there

3   exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient

4   causal connection between the supervisor's wrongful conduct and the constitutional violation." Id.

5   (internal quotation omitted).

6        As stated above, Plaintiff has not specified what role any particular Defendant had in the

7   training and supervision of prison officials.  Plaintiff has not alleged that any Defendant had

8   personal involvement in his constitutional deprivation.  Plaintiff merely accuses Defendants of

9   being negligent in their roles in the prison appeals process.  (See Doc. No. 2).  Further, Plaintiff

10  has not provided any evidence that shows a causal connection between any Defendants' alleged

11  wrongful conduct and a constitutional violation.  Id.  Therefore, Plaintiff had not provided enough

12  evidence to demonstrate that Defendants could be liable as supervisors under a theory of deliberate

13  indifference.  See Starr, 2011 WL 2988827 at *4-5.

14       Plaintiff has not presented sufficient evidence such that a reasonable jury could find that any

15  Defendant knew of and disregarded an excessive risk to Plaintiff's safety.  See Farmer, 511 U.S. at

16  837.  Accordingly, the Court **RECOMMENDS** that summary judgment be **GRANTED** for all

17  Defendants regarding Plaintiff's claims that Defendants failed to protect him from attack.

18       **2.**        **ACCESS TO THE COURTS**

19       Plaintiff's second claim names Defendants C. Terhune, Houston, Butler, Edwards, Fasolo, A.

20  Terhune, and Ormand.  (Doc. No. 2).  Plaintiff claims that each Defendant intentionally interfered

21  with Plaintiff's opportunity to exhaust administrative remedies and by such interference denied

22  Plaintiff access to the Courts.  Exhaustion of administrative remedies was discussed in depth in

23  Section B of this Report & Recommendation.  Although this Court recommends a finding that

24  Plaintiff did not have the opportunity to file a timely 602 grievance, it did not address whether any

25  particular Defendant intentionally caused the delay.  Infra Sec. B.

26       The Supreme Court has acknowledged a right of access to the Courts.  Lewis v. Casey, 518

27  U.S. 343, 350 (1996).  A state prison official is prohibited from actively interfering with inmates'

28  attempts to prepare legal documents.  See id.  Further, the right of meaningful access to the Courts

1    extends to established prison grievance procedures.  See Valandingham v. Bojorquez, 866 F.2d

2    1135, 1140 (1989).  In order to state a claim for relief, a Plaintiff must establish either that: "(1) he

3    was denied access to an adequate law library, or trained legal assistance; or, (2) he was actually

4    denied access to the Courts."  See Vandelft v. Moses, 31 F.3d 794, 796 (1994).  Plaintiff has not

5    alleged that he was denied access to an adequate law library or trained legal assistance.  Plaintiff

6    must then allege that he was actually denied access to the Courts to state a claim.  Id.

7         Plaintiff makes no specific allegations as to any particular Defendants role in intentionally

8    interfering with Plaintiff's exhaustion of administrative remedies.  Plaintiff does attach numerous

9    appeals forms to his Complaint that demonstrate that on several occasions Defendants accepted

10   Plaintiff's appeals and returned them after review.  (Doc. No. 1, Ex. A).  Plaintiff's hardship

11   transfer appeal went through the informal level, first level, second level and directors level review.

12   Id.  In each case it was partially granted, and ultimately led to a UCC determination that Plaintiff

13   should be transferred.  Id.

14        Plaintiff appears to be specifically concerned with his appeal dated May 10, 2002, which was

15   discussed above.  This appeal was screened out as untimely because it was filed more than 15 days

16   after the stabbing attack that was central to the appeal.  (Doc. No. 2 at 40).  Plaintiff contends that

17   during these 15 days, he asked for 602 grievance forms, but prison officials refused to provide him

18   with the forms.  (Doc. No. 115).  As a result, Plaintiff claims he was unable to exhaust his

19   administrative remedies, as discussed above.  See id.

20        Plaintiff has not alleged any specific facts or produced any evidence that any named

21   Defendant refused to provide him with any grievance forms.  While Plaintiff does claim that

22   Defendants Fasolo and Edwards denied Plaintiff's appeal as untimely, denying an appeal in

23   accordance with California Prison Procedure does not constitute intentional interference.  See Cal.

24   Code Regs. tit. 15 § 3084.6(c).

25        Accordingly, Plaintiff has not presented sufficient evidence such that a reasonable jury could

26   find that any Defendant intentionally interfered with Plaintiff's access to the Courts.  Accordingly,

27   the Court **RECOMMENDS** that summary judgment be **GRANTED** for all Defendants regarding

28   Plaintiff's claims that Defendants interfered with Plaintiff's access to the Courts.

1

2

3 **3.      CONSPIRACY**

4        In his third claim Plaintiff alleges that Defendants engaged in a "conspiracy to violate

5 [Plaintiff's] federal constitutional rights for the purpose of retaliation."  (Doc. No. 2).  Plaintiff

6 cites 42 U.S.C. §1985(3) and 42 U.S.C. §1986 as the basis for his claim.  Id.

7 **a.      §1985(3) claim**

8        The Ku Klux Klan Act, 42 U.S.C. § 1985(3), was enacted in 1871 and was meant to protect

9 individuals from conspiracies designed to deprive them of federally protected rights.  Sever v.

10 Alaska Pulp Corp., 978 F.2d 1529, 1536 (9th Cir. 1992).  The statute creates liability for "two or

11 more persons in any State or Territory [who] conspire or go in disguise on the highway or on the

12 premises of another."  42 U.S.C. §1985(3).  The Supreme Court has recognized four elements that

13 a plaintiff must allege and prove to make a valid claim:

14        (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any

15        person or class of persons of the equal protection of the laws, or of equal privileges

16        and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4)

17        whereby a person is either injured in his person or property or deprived of any right

18        or privilege of a citizen of the United States.

19 United Brotherhood of Carpenters and Joiners of America v. Scott, 463 U.S. 825, 828-29 (1983).

20 "Further, the second of these four elements requires that in addition to identifying a legally

21 protected right, a plaintiff must demonstrate a deprivation of that right motivated by 'some racial,

22 or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators'

23 action.'"  Sever, 978 F.2d at 1536 (quoting Griffith v. Breckenridge, 403 U.S. 88, 101 (1971.)).

24        The Supreme Court has declined to answer the question of whether and when § 1985(3)

25 applies in contexts not involving race.  Following the Court's decision in *Griffith*, requiring a

26 showing of invidiously discriminatory animus, various Courts have both expanded and declined to

27 expand § 1985(3) claims beyond racial contexts.  See Canlis v. San Joaquin Sheriff's Posse

28 Comitatus, 641 F.2d 711, 719 n.15 (9th Cir. 1981) (listing often-conflicting federal cases from

across the country).  The Court itself has declined to extend the class-based discriminatory language to non-union employees who were hassled and physically assaulted by union employees and to woman seeking abortions.  <u>Bray v. Alexandria Women's Health Clinic,</u> 506 U.S. 263, 269 (1993); <u>Scott</u>, 463 U.S. at 836.  In *Scott,* the Court noted that "it is a close question whether § 1985(3) was intended to reach any class-based animus other than animus against Negroes and those who championed their cause, most notably Republicans." <u>Scott</u>, 463 U.S. at 836.

The Ninth Circuit employs the rule that for a class to be protected by § 1985(3) it needs to have been a class who "require and warrant special federal assistance in protecting their civil rights." <u>Schultz v. Sundberg,</u> 759 F.2d 714, 718 (9th Cir. 1985).  Specifically, the class needs to have been designated suspect or quasi-suspect. <u>Id.</u>  Plaintiff is a Caucasian inmate.  Plaintiff claims that he was singled out as an inmate informant.  (Doc. No. 81).  He has not identified any suspect or quasi-suspect category of which he is a member.  This alone is sufficient to grant summary judgment. <u>See</u> <u>Scott</u>, 463 U.S. at 836.

Even if Plaintiff could identify himself as a member of a suspect or quasi-suspect class, he had not provided any evidence that Defendants acted with invidiously discriminatory animus, nor does he provide any evidence of a conspiracy.  Plaintiff's Complaint, and Memorandum of Facts and Claims for Relief, contain legal conclusions but no specific facts regarding any particular Defendant's, or group of Defendants', conspiracy that would support his claim.  A mere allegation of conspiracy without factual specificity is insufficient. <u>Karim-Panahi v. Los Angeles Police Dept.,</u> 839 F.2d 621, 626 (9th Cir. 1988).  Therefore, Plaintiff has failed to show any of the four elements required for his § 1985(3) claim.

Further, it would appear that Plaintiff is alleging that his housing at Calipatria alone was sufficient to demonstrate a conspiracy between all Defendants.  (Doc. No. 2).  The Court has already dismissed Plaintiff's claims relating to his classification score and hardship transfer request.  (Doc. No. 34).  All further acts by Defendants alleged in Plaintiff's Complaint and Memorandum of Facts and Claims for Relief seem to be addressed directly at Plaintiff's transfer appeals, each of which was partially granted and which ultimately recommended that Plaintiff be transferred.  (Doc. No. 2).

1    Because Plaintiff has not presented sufficient evidence such that a reasonable jury could find

2    that Plaintiff has proven the elements necessary for a § 1985(3) claim, Defendants Motion for

3    Summary Judgment regarding that claim should be granted.

4        **b.**        **§1986 claim**

5        Title 42, United States Code § 1986 states:

6            Every person who, having knowledge that any of the wrongs conspired to be
             done, and mentioned in section 1985 of this title, are about to be committed,
7            and having power to prevent or aid in preventing the commission of the
             same, neglects or refuses so to do, if such wrongful act be committed, shall
8            be liable to the party injured.

9        The Ninth Circuit has adopted "the broadly accepted principle that a cause of action is not

10   provided under 42 U.S.C. § 1986 absent a valid claim for relief under section 1985." Trerice v.

11   Pedersen, 769 F.2d 1398, 1403 (9th Cir. 1985).  Because Plaintiff does not have a valid claim

12   under section 1985 his 1986 claim must also fail.

13       Plaintiff has not presented sufficient evidence such that a reasonable jury could find that

14   Plaintiff has proven the elements necessary for a § 1985(3) claim.  Accordingly, the Court

15   **RECOMMENDS** that summary judgment be **GRANTED** for all Defendants regarding both

16   Plaintiff's § 1985(3) and § 1986 conspiracy claims.

17       **4.        DELIBERATE INDIFFERENCE TO MEDICAL NEEDS**

18       Plaintiff's Fourth claim names Defendants C. Terhune, Houston, Butler, Edwards, Fasolo, A.

19   Terhune, and Ormand.  (Doc. No. 2).  Plaintiff claims that each Defendant was deliberately

20   indifferent to Plaintiff's serious medical needs.  Id.

21       "[W]hen the State takes a person into its custody and holds him there against his will, the

22   Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and

23   general well-being." DeShaney v. Winnebago County Dept. of Social Services, 489 U.S. 189,

24   199-200 (1989).  Medical care is one of the responsibilities placed on the State, because a prisoner

25   "must rely on prison authorities to treat his medical needs." Estelle v. Gamble, 429 U.S. 97, 103

26   (1976).  A prison official violates the Eighth Amendment when he/she acts with deliberate

27   indifference to a prisoner's serious medical needs.  Id. at 104-105.  Thus, for a prisoner to

28   demonstrate an Eighth Amendment violation two components must be satisfied.  See Wilson v.

<u>Seiter</u>, 501 U.S. 294, 298 (1991).

First, the objective component of an Eighth Amendment violation requires the showing of a serious medical need.  <u>Id.</u>  A serious medical need is demonstrated by a showing that the "failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain."  <u>Jett v. Penner</u>, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citation omitted).

Second, the subjective component of an Eighth Amendment claim requires that the prison official acted with deliberate indifference to the plaintiff's serious medical need.  <u>See Wilson</u>, 501 U.S. at 298.  A prison official acts with deliberate indifference when he/she denies, delays or interferes with the treatment of the serious medical needs of a prisoner.  <u>Estelle</u>, 429 U.S. at 104-5.  "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."  <u>Id.</u>  "[D]eliberate indifference describes a state of mind more blameworthy than negligence."  <u>Farmer v. Brennan</u>, 511 U.S. at 835.  Thus, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."  <u>Estelle</u>, 429 U.S. at 106.  The indifference to medical needs must be substantial; mere malpractice, or even gross negligence, does not constitute cruel and unusual punishment.  <u>Id.</u>

### a.      Serious Medical Need

There is no dispute over whether Plaintiff had a serious medical need.  Plaintiff was stabbed several times and required treatment at a hospital.  (Doc. No. 106 at 30).  Therefore, Plaintiff had a serious medical need.  <u>See Jett</u>, 439 F.3d at 1096.

### b.      Deliberate Indifference

Plaintiff does not allege that any Defendant was present when he was stabbed.  (Doc. No. 2).  Further, Plaintiff neither alleges, nor is there evidence suggesting, that Defendants delayed or interfered with Plaintiff's medical treatment.  <u>Id.</u>  Those Defendants that are alleged to have had contact with Plaintiff, following his attack, are not alleged to be medical professionals, nor are they alleged to have participated in Plaintiff's medical treatment.  <u>See id.</u>  Plaintiff does provide

1   evidence that he was treated both at a hospital and in the OHU.  (Doc. No. 1).  Although Plaintiff

2   claims that his injuries were not adequately treated, Plaintiff provides no evidence that any

3   Defendant contributed to the alleged inadequacy.  Therefore, Plaintiff has not demonstrated that

4   Defendants were deliberately indifferent to his medical needs.  See Estelle, 429 U.S. at 104-5.

5          Plaintiff has not presented sufficient evidence such that a reasonable jury could find that any

6   Defendant was deliberately indifferent to Plaintiff's serious medical needs.  Accordingly, the

7   Court **RECOMMENDS** that summary judgment be **GRANTED** for all Defendants regarding

8   Plaintiff's claim regarding deliberate indifference to medical needs.

9          **5.      CLAIMS AGAINST DEFENDANT C. TERHUNE**

10         Although the claims regarding Defendant C. Terhune are addressed above, because both

11  parties, in their briefs, addressed them separately the Court will briefly address them separately as

12  well.

13         Defendant C. Terhune was not directly involved in any alleged deprivation of Plaintiff's

14  constitutional rights.  He was the Director of the Department of Corrections.  Plaintiff's accusation

15  must be that C. Terhune was liable due to his supervisory role over employees and policies at

16  Calipatria.

17          However, "vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that

18  each Government-official defendant, through the official's own individual actions, has violated the

19  Constitution."  Iqbal, 129 S.Ct. at 1948.  "Government officials may not be held liable for the

20  unconstitutional conduct of their subordinates under a theory of respondeat superior."  Id.  The

21  Ninth Circuit has developed a theory of direct liability based on the supervisor's "training,

22  supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation;

23  or for conduct that showed a reckless or callous indifference to the rights of others."  See Starr,

24  2011 WL 2988827 at *5.  In order to show deliberate indifference, "a plaintiff may state a claim

25  against a supervisor for deliberate indifference based upon the supervisor's knowledge of and

26  acquiescence in unconstitutional conduct by his or her subordinates."  Id. at *4.  "A defendant may

27  be held liable as a supervisor under § 1983 if there exists either (1) his or her personal involvement

28  in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's

1  wrongful conduct and the constitutional violation." Id.

2      As stated above Plaintiff has provided no evidence that Defendant C. Terhune was personally

3  involved with a deprivation of his constitutional rights.  Further, Plaintiff has not alleged, or

4  provided any evidence that there was, a casual connection between any specific act of C. Terhune

5  and his stabbing on April 7, 2002.  Accordingly, the Court **RECOMMENDS** that Defendants

6  Motion for Summary Judgment regarding all claims related to Defendant C. Terhune be

7  **GRANTED**.

8      **6.      QUALIFIED IMMUNITY**

9      Defendants Motion for Summary Judgment claims that even if Plaintiff has met the burden of

10 demonstrating a prima facie case, each Defendant is still entitled to qualified immunity.  Qualified

11 immunity protects a defendant unless: (1) the defendant's action violated a federal constitutional

12 right; and (2) the right was clearly established at the time of the conduct at issue.  See LSO, Ltd.

13 V. Stroh, 205 F.3d 1146, 1157 (9th Cir. 2000).

14     As discussed above, this Court does not find that any Defendant violated a federal

15 constitutional right.  Although the rights Plaintiff claims were violated are clearly established, he

16 presents no evidence that they were actually violated.  See Farmer, 511 U.S. at 833 (reasonably

17 safe conditions of confinement);  Lewis, 518 U.S. at 350 (access to the Courts); Estelle, 429 U.S.

18 at 104-5 (proper medical care).  Accordingly, the Court need not address Defendants' qualified

19 immunity defense.  See Pearson v. Callahan, 555 U.S. 223, 236 (2009).

20     **IV.      CONCLUSION**

21     For the reasons set forth herein, it is **RECOMMENDED**:

22     1) That Defendants' Motion for Summary Judgment be **GRANTED**.

23     This report and recommendation will be submitted to the United States District Judge

24 assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1) (1988).  Any party may

25 file written objections with the Court and serve a copy on all parties by **September 7, 2011** The

26 document shall be captioned "Objections to Report and Recommendation."  Any reply to the

27 objections shall be served and filed by **September 14, 2011.**

28 / / /

1      The parties are advised that failure to file objections within the specified time may waive the

2   right to raise those objections on appeal of the Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153,

3   1156-57 (9th Cir. 1991).

4      **IT IS SO ORDERED.**

5   DATED:  August 16, 2011

6

7                                             Hon. Mitchell D. Dembin

8                                             U.S. Magistrate Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

03cv660-BEN (MDD)